UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:22-cr-00013-JAW |
| | ) | |
| FAYSAL KALAYAF MANAHE | ) | |
| YASER AALI | ) | |
| AMMAR ALKINANI, and | ) | |
| QUASIM SAESAH | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS TO DISMISS THE INDICTMENT AND FOR A PRELIMINARY HEARING CONCERNING CONSPIRACY EVIDENCE**

A defendant moves to dismiss an indictment, arguing that the indictment fails to state a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1, is void for vagueness, and violates his trial and due process rights guaranteed by the Fifth and Sixth Amendments to the United States Constitution.  Because the Court concludes that the indictment plausibly alleges a per se illegal conspiracy to fix wages and allocate employees, the Court dismisses without prejudice the joined motion to dismiss.  At trial, the defendants will have the opportunity to contest whether there was an agreement and argue that their conduct was merely ancillary to a procompetitive purpose.  The Court also declines to hold a pretrial *Petrozziello* hearing regarding the existence of a conspiracy in this case.  Consistent with First Circuit practice, the Court will address the admissibility of alleged co-conspirator statements at trial pursuant to Federal Rule of Evidence 801(d)(2)(E).

## I.     BACKGROUND

On January 27, 2022, a federal grand jury issued a nine-page indictment, charging Faysal Kalayaf Manahe, Yaser Aali, Ammar Alkinani, and Quasim Saesah, and their respective home health care agencies, with engaging in a conspiracy to violate the Sherman Act, 15 U.S.C. § 1, by suppressing and eliminating competition for Personal Support Specialist (PSS) worker services by agreeing to fix the rates paid to PSS workers and by agreeing not to hire each other's workers.  *Indictment* ¶¶ 1-18 (ECF No. 1) (*Indictment*).  The indictment also charged the Defendants with misusing funds they or their companies received through the Small Business Administration's Paycheck Protection Program (PPP) under the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  *Id.* ¶¶ 4-7, 18.

On May 31, 2022, Mr. Alkinani filed a motion to preclude alleged coconspirator statements and for a pre-trial hearing to determine the existence of a conspiracy.  *Mot. to Preclude Alleged Co-Conspirator Statements and for a Preliminary Hr'g to Determine the Existence of a Conspiracy* (ECF No. 66) (*Mot. for Hr'g*).  The Government responded in opposition on June 21, 2022.  *United States' Opp'n to Defs.' Mot. for a Preliminary Hr'g Concerning Conspiracy Evid.* (ECF No. 91) (*Gov't's Opp'n to Hr'g*).  On July 5, 2022, Mr. Alkinani filed his reply in support of his request for a hearing.  *Def.'s Reply to Gov't's Opp'n to Mot. to Preclude Alleged Co-Conspirator Statements and for a Preliminary Hr'g to Determine the Existence of a Conspiracy* (ECF No. 97) (*Mot. for Hr'g Reply*).

On May 31, 2022, Mr. Kalayaf filed a motion to dismiss the indictment, arguing that the indictment fails to allege a per se antitrust violation, fails to otherwise allege an ancillary restraint of trade under a rule of reason analysis, and is void for vagueness. *Def. Faysal Kalayaf Manahe's Mot. to Dismiss* (ECF No. 79) (*Mot. to Dismiss*). On June 21, 2022, the Government responded in opposition. *United States' Opp'n to Defs.' Mot. to Dismiss the Indictment* (ECF No. 89) (*Gov't's Opp'n to Mot. to Dismiss*). On July 6, 2022, Mr. Kalayaf filed his reply. *Def. Faysal Kalayaf Manahe's Reply to Gov't Opp'n to Mot. to Dismiss* (ECF No. 102) (*Mot. to Dismiss Reply*).

The other named defendants each filed motions to join Mr. Alkinani's motion for a hearing and Mr. Kalayaf's motion to dismiss. *Mot. for Leave to File Joinder in Appropriate Mots. Filed by Co-Defs.* (ECF No. 68); *Def. Faysal Kalayaf Manahe's Mot. for Leave to File Joinder in Mots. Filed by Co-Defs.* (ECF No. 77); *Def. Quasim Saesah's Notice of Joining Mots. Filed by Co-Defs.* (ECF No. 81); *Def. Yaser Aali's Notice of Joining in Mots. Filed by Co-Defs.* (ECF No. 82).

## II.    THE JOINED MOTION TO DISMISS

### A.    The Parties' Positions

#### 1.    Faysal Kalayaf Manahe's Motion to Dismiss

First, Mr. Kalayaf asks the Court to dismiss the indictment because "the application of the per se rule as alleged in the Indictment violates the constitutional prohibition . . . against instructing juries that certain facts presumptively establish an element of a crime without any factual finding by a jury." *Mot. to Dismiss* at 8. Mr. Kalayaf argues that, unlike in civil antitrust cases, a conclusive presumption that

certain actions created an unreasonable and anti-competitive restraint of trade and commerce is "never allowed in criminal cases." *Id.* at 9.  He relies on *United States v. United States Gypsum Company*, 438 U.S. 422 (1978), to challenge the Government's per se theory and argues that a jury must conclude beyond a reasonable doubt that the Defendants met every element of a criminal antitrust violation. *Id.* at 11-12.  Mr. Kalayaf urges the Court to instead apply the rule of reason, like the *Gypsum* Court, because "the indictment does not allege that the Defendants actually fixed wages or agreed not to solicit or hire others' employees." *Id.* at 13.  He says that under the Supreme Court's recent decision in *National Collegiate Athletic Association v. Alston*, 141 S. Ct. 2141 (2021):

> [T]he government must prove beyond a reasonable doubt to a jury the following three elements to trigger the *per se* rule:
>
> 1. The Defendants' actions had an anticompetitive effect;
> 2. There is no procompetitive rationale for the Defendants' actions; and,
> 3. The procompetitive elements of Defendant's actions could be achieved through less restrictive means.

*Id.* at 21-23.  Even if the per se rule applies, Mr. Kalayaf argues that the Government's "bald assertion[s] [are] inadequate for this Court to find that Defendant's actions are pervasively anti-competitive," namely because the indictment does not allege an overt act or that the alleged conspirators "in fact, ever 'fixed' wages or followed any 'no-poach'" rule. *Mot. to Dismiss* at 14-15.  He cites *Alston* to caution the Court against applying the per se rule unless it has "considerable experience with the type of restraint at issue and can predict with

confidence" that it violates antitrust law. *Id.* at 16 (quoting *Alston*, 141 S. Ct. at 2156) (internal quotation marks and citations omitted).

### 2.    The Government's Opposition

The Government says Mr. Kalayaf's motion to dismiss "is premised on mischaracterizations of the Indictment and misconstructions of the law" and improperly "based on extrinsic evidence . . . which the Court cannot consider when determining the sufficiency of an indictment." *Gov't's Opp'n to Mot. to Dismiss* at 1. It explains that both price fixing and market allocation are "per se unlawful under decades of Supreme Court and First Circuit precedent, regardless of the industry and regardless of whether the conspirators are sellers, buyers, or employers." *Id.* The Government submits that courts "condemn wage-fixing agreements as *per se* illegal" in both criminal and civil cases under the Supreme Court's decision in *Anderson v. Shipowners' Association of the Pacific Coast*, 272 U.S. 359 (1926). *Id.* at 7 (collecting cases). Similarly, it argues that "[w]hen competitors conspire to not hire one another's employees, they are engaging in *per se* illegal market allocation." *Id.* (collecting cases). The Government says that Mr. Kalayaf's theory "would effectively eliminate the *per se* rule because courts could apply it only in the precise industry and social and economic circumstances previously encountered." *Id.* at 10 n.2.

Next, the Government says that Mr. Kalayaf cannot rely on *Alston*, which "reaffirm[ed] that the *per se* rule condemns horizontal restraints that 'obviously threaten to reduce output and raise prices,'" as a basis for applying the rule of reason in this case because the alleged "conspiracy stands on the same footing as a naked

horizontal price-fixing and market allocation restraint." *Id.* at 12-13 (quoting *Alston*, 141 S. Ct. at 2154-57).

The Government goes on to assert that the *Gypsum* standard is "expressly limited" to rule of reason cases, and that here it "need not prove either an overt act or anti-competitive effects under the *per se* rule." *Id.* at 13-14. It says Mr. Kalayaf cannot use an "ancillary restraint" defense on a motion to dismiss to avoid the per se doctrine because (1) this case lacks allegations "that the Defendants themselves carried out a legitimate and procompetitive business transaction or venture to which their wage-fixing and worker-allocation conspiracy could be 'ancillary'" and (2) he cannot ask the Court to consider facts beyond the indictment itself at this stage. *Id.* at 15.

The Government firmly rejects Mr. Kalayaf's characterization of the "*per se* rule as an unconstitutional evidentiary presumption." *Id.* at 16. It says that under Supreme Court precedent, "the *per se* rule does not change what is required to prove a crime; it is instead an 'interpretation[] of the Sherman Act' that categorically prohibits certain types of conduct." *Id.* at 17 (alteration in original) (quoting *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 432-33 (1990)). After recounting Supreme Court decisions applying the per se rule to criminal prosecutions, the Government concludes that "instructing a jury that it may find a defendant guilty of violating Section 1 based on a finding that he entered into a price-fixing agreement— without a separate inquiry into whether the agreement was reasonable—does not

'deny a jury decision as to an element of the crime.'" *Id.* at 17-18 (quoting *United States v. Mfrs. Ass'n of the Relocatable Bldg. Indus.*, 462 F.2d 49, 52 (9th Cir. 1972)).

Finally, the Government urges the Court to reject Mr. Kalayaf's vagueness and due process challenges because "price-fixing labor and allocating markets have long been *per se* illegal under the Sherman Act." *Id.* at 20. It says the "Defendants received all the process they were due in being charged with conspiracy to fix wages and allocate workers." *Id.* at 19.

### 3.     Faysal Kalayaf Manahe's Reply

In reply, Mr. Kalayaf begins by addressing the circumstances surrounding the alleged conspiracy, recounting the Defendants' efforts to resolve "a dispute . . . in Maine's immigrant community" following "attempt[s] to steal clients and reduce competition" in the PSS industry. *Mot. to Dismiss Reply* at 2-3. He acknowledges that his motion "is based, in part, on extrinsic evidence" but submits that he has properly demonstrated that the Defendants' "actions did not have any anti-competitive effect, were not unreasonable, and there are insufficient facts alleged [in the Indictment] to support a finding that the Defendants' actions were anti-competitive *per se*." *Id.* at 3-5. Mr. Kalayaf contends that "the Indictment selectively cites a number of discussions that allegedly form the conspiracy" but "is missing . . . an allegation that the Defendants did anything more than discuss these issues." *Id.* at 5.

Mr. Kalayaf frames the "discussions" alleged in the Indictment as "ancillary to an attempt to resolve discord and disputes between" the Defendants and others over

client stealing, pursuant to the "Association of New Mainers Business Owners and Service Providers Conflict Resolutions Agreement." *Id.* at 6.  He explains that "[u]nfortunately, the members of the Association were unable to reach an agreement, the written agreement was not signed and, from that failure to reach an agreement, the present prosecution has arisen." *Id.*

B.    **Legal Standard**

The Federal Rules of Criminal Procedure provide that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Sepulveda*, 15 F.3d 1161, 1192 (1st Cir. 1993).

"Unlike civil actions, an indictment is not generally subject to dispositive motion practice." *United States v. Poulin*, 645 F. Supp. 2d 17, 22 (D. Me. 2009); *see also United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000).  "[D]ismissing an indictment is an extraordinary step," *Li*, 206 F.3d at 62 (quoting *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997)), because, by returning an indictment, a grand jury is carrying out a constitutionally sanctioned function.  *See* U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . ..").  As the First Circuit has

explained, "[w]hen a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. U.S. Dist. Ct.*, 53 F.3d 1349, 1360 (1st Cir. 1995). This power is "appropriately reserved, therefore, for extremely limited circumstances," *id.* (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988)), and should be "exercised with caution," *United States v. Cameron*, 662 F. Supp. 2d 177, 180 (D. Me. 2009).

In addressing a challenge to an indictment, a district court must simply determine "whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011) (citation omitted). The Court should not inquire into the sufficiency of the evidence supporting the indictment. *United States v. Maceo*, 873 F.2d 1, 2-3 (1st Cir. 1989) ("[A]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits" (citation omitted)). Rather, at this stage, the Court "must accept the allegations in the indictment as true." *United States v. Young*, 694 F. Supp. 2d 25, 27 (D. Me. 2010) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952)); *see also* FED. R. CRIM. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits").

## C.   Discussion

### 1.   The Charged Conspiracy

The one-count indictment charges the Defendants with violating § 1 of the Sherman Act[1], 15 U.S.C. § 1, by conspiring to "suppress and eliminate competition for the services of PSS workers by agreeing to fix the rates paid to PSS workers and by agreeing not to hire each other's PSS workers." *Indictment* ¶ 15.  The indictment further states that the Defendants agreed to "refrain from raising the hourly rates of the PSS workers employed by their respective home health care agencies, and that they would allocate PSS workers by not hiring each other's PSS workers." *Id.* ¶ 16.

The indictment alleges that a conspiracy was formed and effectuated by the Defendants, each of whom is an owner or manager of a home healthcare agency that employs PSS workers in the Portland or Augusta, Maine, area, to eliminate competition for PSS workers.  *Id.* ¶¶ 5-8, 12, 15, 16.  The indictment contains ten paragraphs describing virtual and in-person meetings and communications in which the Defendants and others agreed to take specific actions in furtherance of the conspiracy.  *Id.* ¶ 17(a)-(j).

To further their conspiracy, the Defendants allegedly agreed to pressure competing employers to retract their own PSS wage increases.  *Id.* ¶ 17(e).  The Defendants also allegedly tried to eliminate competition by attempting to recruit

---

[1]     Section 1 of the Sherman Act, which authorizes both civil and criminal prosecutions of antitrust violations, provides in relevant part that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.  Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony.

15 U.S.C. § 1.

additional competing PSS agencies to join their wage-fixing and "no-poach" conspiracy. *Id.* ¶¶ 17(f), (g).

Notwithstanding these allegations, Mr. Kalayaf urges the Court to dismiss the indictment in part because "[n]o one interviewed by the government stated that an agreement was ever reached, only that there were 'discussions' about fixing rates." *Mot. to Dismiss* at 19. He presents the Defendants' companies' payroll records to demonstrate that "[d]uring the alleged time-frame . . . none of the Defendants paid the same hourly wages to their PSSs, or even paid the amounts that they" discussed, according to the indictment. *Id.* He argues that the per se antitrust violation alleged in the indictment is "constrained by a defendant's right to a jury trial" and presents an unconstitutional evidentiary presumption. *Id.* at 17 n.8 (quoting *Young*, 694 F. Supp. 2d at 27).

### 2. The Per Se Rule Against Price-Fixing and Market Allocation

To charge a violation of § 1 of the Sherman Act, an indictment must allege that the defendant knowingly entered into an unreasonable restraint of interstate trade, which can be unreasonable under one of two standards: (1) the per se unreasonable standard and (2) the "rule of reason" standard. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). Where the per se standard does not apply, courts invoke the rule of reason balancing analysis. *Am. Express Co.*, 138 S. Ct. at 2284 ("Restraints that are not unreasonable *per se* are judged under the 'rule of reason'").

### a. The Per Se Standard

The per se rule typically applies to horizontal restraints between competitors, such as price fixing, bid rigging, and market allocation, based on their inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911); *see also Am. Express Co.*, 138 S. Ct. at 2283-84 ("Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors' qualify as unreasonable *per se*") (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)); *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011) ("[A]greements to fix prices are 'so plainly anticompetitive' that they are per se illegal") (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)).  Under the per se rule, the government must prove that the defendant knowingly conspired to engage in the conduct but need not prove that the agreement was factually unreasonable.  *United States v. Peake*, 804 F.3d 81, 93 n.10 (1st Cir. 2015) ("A per se Section 1 violation is not excused by a showing that the supra-competitive prices were somehow still reasonable").

### b.    The Ancillary Restraints Doctrine

The "ancillary restraints doctrine," which "governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities," may exempt such agreements from the per se rule, such that the rule of reason applies.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006); *see United States v. Aiyer*, 33 F.4th 97, 115-16 (2d Cir. 2022); *Aya Healthcare Servs. Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021).  When this doctrine applies, "courts must determine whether the nonventure restriction is a naked

restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid." *Dagher*, 547 U.S. at 7.

Mr. Kalayaf emphasizes that the charged conspiracy is missing an "overt act" or allegation that the Defendants in fact fixed wages. *Mot. to Dismiss* at 2, 15. He submits that they are actually being prosecuted for anticompetitive conduct "ancillary" to a legitimate, procompetitive collaboration between PSS companies in the greater Portland area. *Id.* at 24-25. He says that "[a]ny alleged 'agreement' was rather a discussion" to resolve community disputes over client-stealing, pursuant to which "no consensus was ever reached [and] no meeting of the minds ever occurred." *Id.* at 26.

As the Court reads the indictment, it alleges a per se illegal horizontal conspiracy. Mr. Kalayaf is correct that the Defendants have a valid defense to the per se rule if they can show that any restraint resulting from the alleged arrangement was ancillary to efficiency-enhancing economic activity. But whether the nature of the Defendants' association was that of a legitimate, pro-competitive venture or an agreement amongst competitors to suppress competition and prevent their PSS workers from receiving CARES Act wage increases is a question of fact that can only be resolved with evidence beyond the four corners of the indictment, not at the motion to dismiss stage. As an affirmative defense, the burden of proof would be on the Defendants, not on the Government. *See Bd. of Regents of Univ. of Okla. v. National Collegiate Athletic Ass'n*, 707 F.2d 1147, 1154 n.9 (10th Cir. 1983), *aff'd* 468 U.S. 85,

13

104 (1984) (finding that "the burden of proving the effectiveness and necessity" of price restraints "when considering whether to apply per se or rule of reason analysis" is properly placed on the party arguing that the restraints are "ancillary to a legitimate integration").

The fact that the Government does not allege an ancillary arrangement is not grounds to dismiss the indictment. *See United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses"). To the extent the Defendants wish to make a factual showing that their conduct was part of a procompetitive venture and that their alleged agreement was a subordinate, collateral, or reasonably necessary restraint, they will have the opportunity to do so at trial. A challenge on this ground is not appropriate at the motion to dismiss stage.

### 3. The Per Se Rule and the Charged Conspiracy

Mr. Kalayaf argues that the per se rule of antitrust law "directly conflicts with the constitutional requirement that the government prove to a jury every element of an offense beyond a reasonable doubt." *Mot. to Dismiss* at 10.

Mr. Kalayaf insists that "'the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition' so as to trigger the per se rule." *Id.* at 8 (quoting *State Oil v. Khan*, 522 U.S. 3, 10 (1997)). The *Khan* Court, however, did not hold that the finder of fact must determine whether to "trigger" the per se rule as opposed to the rule of reason, but rather set out what "the finder of fact must decide" where the rule of reason framework applies. 522 U.S. at 10; *see United*

14

*States v. Vega-Martínez*, 949 F.3d 43, 52 (1st Cir. 2020) ("Determining the defendants' liability for [per se illegal] conduct did not require the jury to assess its supposed reasonableness").

The First Circuit has not directly addressed the constitutionality of the per se rule in a criminal case, but as the Government points out, other Circuits have expressly rejected Mr. Kalayaf's position. *See Gov't's Opp'n to Mot. to Dismiss* at 19; *see, e.g., Mnfs. Ass'n*, 462 F.2d at 50 ("Appellants' contention that the *per se* rule constitutes an unconstitutional conclusive presumption misunderstands the Sherman Act"); *United States v. Sanchez*, 760 F. App'x 533, 535 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 909 (2020) (Adopting *Manufacturers'* holding that "the per se rule is not an evidentiary presumption at all") (emphasis omitted).

Mr. Kalayaf points to *NCAA v. Alston*, 141 S. Ct. 2141 (2021), as an indication that the Supreme Court is turning away from the per se rule. In *Alston*, college athletes brought suit against the NCAA, claiming its agreement with member schools to limit compensation to student athletes amounted to an unlawful restraint of trade in violation of the Sherman Act. The Supreme Court affirmed a judgment that evaluated the NCAA's limit on student-athlete compensation under the rule of reason. *Alston*, 141 S. Ct. at 2157. Even though the NCAA defendants admitted that their conduct constituted "horizontal price fixing in a market where [they] exercise monopoly control," *id.* at 2154, the Court took "special care not to deploy" the per se rule given the "often hard-to-see efficiencies attendant to complex business arrangements." *Id.* at 2156.

15

Mr. Kalayaf argues that *Alston* demands a rule of reason analysis of the alleged wage-fixing and worker allocation conspiracy.  The Court interprets *Alston*, however, in the context of the unique line of athletic league-related antitrust caselaw.  For example, for many years, the Supreme Court has declined to condemn the NCAA's restraints as illegal per se because the "horizontal restraints on competition are essential if the product is to be available at all."  *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 101.  Contrary to Mr. Kalayaf's argument, the fact that the Supreme Court evaluated the NCAA's wage-fixing under the rule of reason does not require the Court to abandon the applicable per se rule in this case.  *See id.* at 103.

Mr. Kalayaf points to post-*Alston* caselaw in which other district courts have applied the rule of reason to "no-poach" agreements between employers.  *See Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 U.S. Dist. LEXIS 140735, at *16 (N.D. Ill. July 28, 2021); *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 U.S. Dist. LEXIS 142272, at *35 (S.D. Ill. July 23, 2021).  As the Government points out, however, *Conrad* and *Deslandes* both "concerned no-hire provisions in franchise agreements" and neither "bolsters Defendants' apparent theory that *Alston* tacitly upended the *per se* rule's settled application to naked buyer-side cartels."  *Gov't's Opp'n to Mot. to Dismiss* at 13.  In light of the factually different circumstances, the Court is unpersuaded that it should extend a broad reading of *Alston* to this alleged conspiracy to fix wages and allocate employees among competitors who have no franchise or sports league relationship.  The Court concludes that the indictment alleges a recognized per se illegal form of market allocation

among purchasers of labor. *See United States v. DaVita*, No. 1:21-cr-00229-RBJ, 2022 U.S. Dist. LEXIS 16188, at *23-24 (D. Colo. Jan. 28, 2022) (concluding that no-poach agreements that allocate the labor market are a type of horizontal restraint that courts have long recognized as a per se Sherman Act violation).

Even accepting Mr. Kalayaf's argument that courts have been (and should be) hesitant to condemn no-poach or no-hire agreements as per se illegal, the indictment charges a single conspiracy that could only be accomplished with a combination of mutually reinforcing restraints: the alleged no-hire agreement ensured that the PSS employers could cap wages without losing their workers to a local competitor. *See id.* at *23 ("Defendants are correct that no-hire agreements have not been made into their own category subject to per se treatment.  However, those naked no-hire agreements that allocate the market have been considered per se unreasonable as horizontal market allocation agreements").  Thus even if the Court concluded that the alleged no-hire agreement on its own warranted rule of reason analysis of its purported procompetitive purpose, the Court would allow the case to proceed on the single count of an overarching conspiracy to suppress competition in the Maine PSS industry.  The same factual allegations and legal issues underpin both theories of criminal anticompetitive conduct.

This case is distinguishable from *Aya Healthcare Services v. AMN Healthcare Inc.*, 9 F.4th 1102 (9th Cir. 2021), in which a horizontal restraint between would-be competitors in the healthcare industry did warrant rule-of-reason analysis.  In *Aya*, one healthcare staffing company contracted with another to provide additional labor.

*Id.* at 1106.  Their contract contained a non-solicitation clause, which the Ninth Circuit deemed ancillary because it was "reasonably necessary to the parties' procompetitive collaboration."  *Id.* at 1110.  The *Aya* Court reasoned "[t]he non-solicitation agreement . . . promotes 'competitiveness in the healthcare staffing industry'—more hospitals receive more traveling nurses because the non-solicitation agreement allows AMN to give spillover assignments to Aya without endangering its" own business partnerships and network of customers.  *Id.* (quoting *Aya Healthcare Servs., Inc.*, No. 17cv205-MMA (MDD), 2020 U.S. Dist. LEXIS 139286, at *43-44 (S.D. Cal. May 20, 2020)).

Two other district courts recently faced motions to dismiss assertedly novel criminal antitrust prosecutions brought against employers, alleging conspiracy to restrain the labor market.  The charged conspiracy here combines the restraints that those courts deemed per se illegal: wage-fixing and "no-poach" or "no-hire" agreements.  *United States v. Jindal*, No. 4:20-CR-00358, 2021 U.S. Dist. LEXIS 227474 (E.D. Tex. Nov. 29, 2021), which Mr. Kalayaf submits was wrongly decided, dealt with similar wage fixing allegations.  The defendant in *Jindal*, the former owner of a healthcare staffing company, was charged with a per se §1 violation based on an alleged scheme to fix the wages paid to physical therapists and therapist assistants in the region.  *Id.* at *3-4.  The United States District Court for the Eastern District of Texas denied a motion to dismiss the indictment, finding that a horizontal agreement among buyers in the labor market to fix the price of labor is a form of price

fixing and thus per se illegal. *Id.* at *21 ("price-fixing agreements—even among buyers in the labor market—have been per se illegal for years").

In *United States v. DaVita*, No. 1:21-cr-00229-RBJ, 2022 U.S. Dist. LEXIS 16188, (D. Colo. Jan. 28, 2022), the United States District Court for the District of Colorado concluded that no-hire or non-solicitation agreements that allocate the employment market are a type of per se illegal restraint. *Id.* at *24. The *DaVita* Court acknowledged that "there are no cases perfectly analogous to this [criminal prosecution of a no-hire agreement]" and observed "that is the nature of Section 1 of the Sherman Act: as violators use new methods to suppress competition by allocating the market or fixing prices these new methods will have to be prosecuted for a first time." *Id.* at *14-15 (analogizing no-hire agreements to an agreement not to solicit customers among horizontal competitors, deemed per se illegal by the Sixth Circuit) (citing *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988)).

Both the *Jindal* and *DaVita* Courts thus rejected Mr. Kalayaf's invitation to apply the rule of reason to the per se violations charged in the indictment. *Id.* at *19-24; *Jindal*, 2021 U.S. Dist. LEXIS 227474, at *24-26; *see Aiyer*, 33 F.4th at 117 ("[I]n a criminal antitrust case, a district court has no pretrial obligation to consider a defendant's evidence of competitive effects in order to determine whether or not the indictment properly charges an actual per se offense").

Nevertheless, Mr. Kalayaf cautions that "this Court does not have sufficient experience with personal care services among the immigrant community during a

pandemic" to proceed with a per se analysis. *Mot. to Dismiss* at 24. Setting aside the threshold issue that Mr. Kalayaf's arguments about the unique PSS market and his references to matters beyond the four corners of the indictment are not properly before the Court in assessing this motion to dismiss, the Court disagrees. Faced with a similar argument, the *DaVita* Court observed:

> Horizontal market allocation agreements are traditionally subject to per se treatment under Section 1 of the Sherman Act. . . . There is less precedent on per se treatment of horizontal market allocation agreements allocating employment markets, but that makes no difference. Even if there were no such history, anticompetitive practices in the labor market are equally pernicious—and are treated the same— as anticompetitive practices in markets for goods and services.

*DaVita*, 2022 U.S. Dist. LEXIS 16188, at *7-8 (citing *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman Act] statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated" (internal citations omitted))). Thus, the *DaVita* Court rejected a similar "judicial experience" invitation to create an exception to the general rule, finding that "if naked non-solicitation agreements or no-hire agreements allocate the market, they are per se unreasonable." *Id.* at *24-25; *see also Jindal*, 2021 U.S. Dist. LEXIS 227474, at *21 (E.D. Tex. Nov. 29, 2021) (rejecting the defendants' argument that there is insufficient judicial experience to condemn wage fixing as per se illegal, because "price-fixing agreements—even among buyers in the labor market—have been per se illegal for years").

At the motion to dismiss stage, the Court rejects Mr. Kalayaf's proposed exception to the per se rule because the Defendants' alleged agreement to engage in horizontal price-fixing and market-allocation falls within the category of restraints long condemned as inherently anticompetitive.  Under Supreme Court precedent, the per se rule need not "be rejustified for every industry that has not been subject to significant antitrust litigation." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 348-51 (1982) (applying the per se rule to horizontal agreements among competing physicians to set maximum reimbursement fees).  Section 1 of the Sherman Act criminalizes an agreement in restraint of trade, thus the question for the jury at trial will be whether a per se unlawful agreement to fix wages and allocate workers was formed.

### 4.    The Sufficiency of the Indictment

Mr. Kalayaf argues that the indictment fails to trigger the per se rule absent allegations "that anyone reduced or limited wages, engaged in 'no-poach' actions or took any steps to actually restrain competitive commerce." *Mot. to Dismiss Reply* at 5.  His offer of proof centers on the "lack of trust" between the participants who attended the meetings recounted in the indictment and various individuals' interview statements that they never intended to bind themselves to anything. *Mot. to Dismiss* at 18.  He further emphasizes that "not all of the attendees could agree on the terms" and that no one signed the draft of proposed terms referenced in the Indictment. *See id.*

To prove a per se criminal violation of 15 U.S.C. § 1, the Government must prove that (1) the defendant knowingly formed, joined, or participated in a contract, combination, or conspiracy; (2) its purpose was to fix, raise, maintain, or stabilize prices; and (3) the activities subject to the conspiracy occurred in the flow of interstate commerce or substantially affected interstate commerce.  15 U.S.C. § 1; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 219-20, 223 (1940).

Count One sufficiently alleges facts constituting a per se violation of the Sherman Act.  Overt acts in furtherance of the conspiracy are not essential elements of the offense.  *See Vega-Martínez*, 949 F.3d at 52 (deeming bid rigging and market allocation "both per se violations of the Sherman Act" and rejecting the argument that the "ultimate cost-effectiveness" of the alleged agreement undercut the allegation of a per se violation).  Moreover, once the Government demonstrates that a defendant has engaged in conduct that is per se illegal, the Court is not required to undertake a detailed inquiry into the conduct's precise harm or business purpose or apply a rule of reason balancing test.  On the per se violation charged in the indictment, the Defendants' criminal liability centers on whether an illegal agreement exists, rather than on the agreement's purpose or effects.  Again, the time for the Defendants to challenge the strength of the Government's case is at trial.

### 5.   Vagueness and Notice

Finally, Mr. Kalayaf argues that "application of the per se rule renders the Sherman Act as alleged in the Indictment void for vagueness," in violation of the Defendants' Fifth and Sixth Amendment rights.  *Mot. to Dismiss* at 26.  He contends

22

that the indictment "simply alleges a violation of the per se rule" and "does not adequately provide notice . . . as to what conduct is permitted and what conduct is proscribed." *Id.* at 27-28. Mr. Kalayaf reasons that "the Sherman Act cannot be construed to impose strict liability for mere discussion of these issues any more than the per se rule can be strictly employed to mere sharing of information under an ancillary agreement in *U.S. Gypsum*." *Id.* at 28.

A criminal statute is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Phillipos*, 849 F.3d 464, 477 (1st Cir. 2017) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "A criminal statute is not unconstitutionally vague merely because it sets forth a standard for determining liability that is not mathematically precise." *Id.*

In *Nash v. United States*, 229 U.S. 373 (1913), the Supreme Court rejected a vagueness challenge to section one of the Sherman Act. *Id.* at 378 ("We are of opinion that there is no constitutional difficulty in the way of enforcing the criminal part of the act"); *see also Johnson v. United States*, 576 U.S. 591, 603-04 (2015) ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree'" (quoting *Nash*, 229 U.S. at 377)). The Supreme Court has also clarified that vagueness standards are not as stringent "where the statute is directed only at

23

conduct designed to destroy competition, activity which is neither constitutionally protected nor socially desirable." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 36 (1963).

Because the horizontal restraints alleged in the indictment have long been held per se unreasonable, the Court rejects, consistent with the *DaVita* and *Jindal* Courts, Mr. Alkinani's vagueness and notice challenge. "[T]he Supreme Court has long recognized that § 1 categorically prohibits per se unlawful restraints across all markets and industries—including restraints on the buyer side and in the labor market." *Jindal*, 2021 U.S. Dist. LEXIS 227474, at *29. "Regardless of whether the Indictment characterizes Defendants' conduct as wage fixing or price fixing, the Sherman Act, in conjunction with the decades of case law, made it 'reasonably clear' that Defendants' conduct was unlawful." *Id.* at *29 (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)); *see Davita*, 2022 U.S. Dist. LEXIS 16188, at *26 ("[T]he conduct proscribed by Section 1 is allocating the market. . . . The fact that defendants allegedly allocated the market in a novel way—by using a non-solicitation agreement—does not matter. Defendants had ample notice that entering a naked agreement to allocate the market would expose them to criminal liability, however they did it").

### D.   Conclusion

To the extent that Mr. Kalayaf's arguments involve facts or conjecture regarding what evidence may be presented at trial, such arguments are improper. A Rule 12(b) motion alleging a defect in an indictment does not "provide[] an occasion

to force the government to defend the sufficiency of its evidence to be marshalled in support of proving the charged offense." *United States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st Cir. 2019). The Court dismisses without prejudice the joined motion to dismiss the Indictment.

## III.   THE JOINED MOTION FOR PRELIMINARY HEARING

Mr. Alkinani seeks a *Petrozziello* ruling in advance of trial with regard to any coconspirator statements that the Government seeks to introduce in its case-in-chief. *See United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977). He urges the Court to hold a hearing to determine the existence of a conspiracy in advance of trial because: (1) there is "evidence supporting the lack of an agreement" in this case; and (2) a pretrial ruling promotes judicial efficiency. *Mot. for Hr'g* at 14, 18.

### A.   The Parties' Positions

#### 1.   Ammar Alkinani's Position

Mr. Alkinani asks the Court to "require the government to identify, pre-trial, what statements, from which co-conspirators, it intends to offer at trial" and then hold a pre-trial *Petrozziello* hearing to determine the admissibility of those statements. *Id.* at 7. He says a hearing will "permit a more straightforward presentation of the evidence; lessen the risk of confusion to the jury; avoid needless, time-consuming interruption of the trial; prevent unfair overreaching in opening statements, and spare the Defendants the need to guess at the government's hidden proofs." *Id.*

Mr. Alkinani goes on to challenge the Government's conspiracy theory and alleged "agreement," contending that "[a]n attempt or solicitation to enter into an agreement to fix wages or for market allocation of employees that is not successful is not prosecutable under § 1." *Id.* at 8. Because "there cannot be a per se violation without an agreement," he says the Court must preliminarily determine whether the indictment presents "meetings, informal discussions, and telephone calls [which] are merely the necessary incidents of normal business conduct" or an illegal conspiracy to violate antitrust law. *Id.* at 9. Mr. Alkinani submits that the Government's various proffer agreement interviews and the unsigned "Conflict Resolution Agreement" document all indicate that "no agreement to limit wages or not poach PSS employees was ever reached." *Id.* at 9-13. As "[f]urther evidence supporting the lack of an agreement or conspiracy," he explains that "[d]uring the alleged time-frame of this 'conspiracy' . . . none of the Defendants paid the same hourly wages to their PSSs, or even paid the amounts that they mentioned during their text conversations or meetings that they were going to pay." *Id.* at 14.

Mr. Alkinani goes on to recite the Third Circuit's procedure for pretrial determination of the admissibility of co-conspirator statements. *Id.* at 15-16 (citing *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 457 (3d Cir. 1979)). Under First Circuit law, he emphasizes that the Court "clearly has the discretion to hold a pretrial *Petrozziello* hearing," which he contends "is the better way to proceed in this matter, given the clear indication by government witnesses that no agreement was ever

reached, which would negate any alleged violation of §1 of the Sherman Act." *Id.* at 18.

### 2.   The Government's Opposition

According to the Government, the "Defendants' factual arguments are improper and their procedural arguments are wrong." *Gov't's Opp'n to Hr'g* at 2.

First, it submits that the "Defendants' factual arguments are untimely" at the pretrial stage, observing that criminal "defendants may only challenge the sufficiency of the allegations of an indictment under Rule 12(b)(1)(B)." *Id.* at 4.  It contends that only the jury may "resolve factual disputes, such as the existence of the alleged conspiracy." *Id.*  The Government accordingly urges the Court to "reject [the] Defendants' request to hold a pretrial hearing to assess the sufficiency of the government's evidence under the guise of an evidentiary determination." *Id.* at 5.

The Government says that Mr. Alkinani ignores key allegations of the indictment, "such as the expressed agreement amongst the Defendants in early April . . . or their refraining from hiring each other's PSS workers" and instead "imagine[s] a different conspiracy centered on meetings on and after April 26." *Id.* at 5-6.  It concludes by urging the Court to "conditionally admit co-conspirator statements introduced at trial . . . before making a final determination on the statements' admissibility under *Petrozziello* at the close of evidence." *Id.* at 8.  It notes that "[i]f, upon review of the evidence, the Court finds that the government has not met its burden of establishing the Federal Rule of Evidence 801(d)(2)(E) predicates by a

preponderance of the evidence, the Court can rely on a cautionary instruction to the jury, or, on appropriate motion, declare a mistrial to cure any prejudice." *Id.*

### 3.    Ammar Alkinani's Reply

In reply, Mr. Alkinani disputes that "partial statements among the four named Defendants" in a virtual chatroom can form the basis of a conspiracy, because any such statements were "taken out of context" and "constitute, at best, only preliminary discussions about a possible resolution to a problem." *Mot. for Hr'g Reply* at 1-2.  He reasons that even if the Defendants wanted to set wages, "[w]ithout the agreement of the other agencies, which never occurred," they would have been the only ones paying lower wages and could not have achieved the alleged conspiracy objective.  *Id.* at 2 (emphasis omitted).  He maintains that "there was never an agreement or meeting of the minds among any of the agencies in [the PSS] industry" formed at the later meetings mentioned in the indictment.  *Id.*  Mr. Alkinani cites the Department of Justice's "own anti-trust training manual for federal law enforcement" to argue that "[a]ttempts or solicitations to enter into agreements to fix prices, rig bids, or allocate markets that are unsuccessful are not prosecutable under §1."  *Id.* at 3.   He emphasizes that "despite what was said in the chat room on April 9, 2020, there is absolutely no evidence that any of the four agencies controlled by the Defendants ever limited the rate to their PSS workers to $15-16."  *Id.* at 4.

Mr. Alkinani reasons that "[t]he mere fact that these Defendants may have 'wanted' all of the health care agencies to limit the rates paid to their PSS workers simply does not a conspiracy make."  *Id.*  He concludes that without a conspiracy

"there cannot be any co-conspirator statements, which is why Mr. Alkinani seeks a preliminary hearing in this case." *Id.* at 5.  Because "there cannot be a per se violation without an agreement," he urges the Court to hold a pretrial *Petrozziello* hearing to determine whether "the meetings, informal discussions, and telephone calls are merely the necessary incidents of normal business conduct" as he suggests.  *Id.* at 5-6.

## B.   Discussion

The Court concludes that it will be best-positioned to rule on the admissibility of co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E) during trial, in accordance with *Petrozziello* and First Circuit practice.

### 1.   Legal Standard

Under Federal Rule of Evidence 801(d)(2)(E), "statements made by a defendant's co-conspirators 'during and in furtherance of the conspiracy' do not qualify as hearsay." *United States v. Ford*, 839 F.3d 94, 105 (1st Cir. 2016) (quoting FED. R. EVID. 801(d)(2)(E)).  To admit such statements against a defendant, the government "must prove, by a preponderance of the evidence, that the declarant and the defendant were members of a conspiracy when the statement was made, and that the statement was made in furtherance of the conspiracy." *United States v. Ciresi*, 697 F.3d 19, 25 (1st Cir. 2012).

"A district court's determination 'as to whether this burden has been met is known in this circuit as a *Petrozziello* ruling,'" after the First Circuit's holding in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  *Id.* (quoting *United States*

29

*v. Mitchell*, 596 F.3d 18, 23 (1st Cir. 2010)).   "A court may provisionally admit a statement under Rule 801(d)(2)(E) and defer its final *Petrozziello* ruling until the close of evidence."   *United States v. Paz-Alvarez*, 799 F.3d 12, 29 (1st Cir. 2015).

### 2.   Analysis

Mr. Alkinani seeks a preliminary hearing regarding evidence that the Government may seek to introduce at trial in accordance with Rule 801(d)(2)(E).   He cites Third Circuit authority in support of his assertion that unless the Court holds a pre-trial hearing to determine "that a joint undertaking existed at the time of the statement or action," *Mot. for Hr'g* at 19-20 (quoting *United States v. Trowery*, 542 F.2d 623, 626-27 (3d Cir. 1976)), "any alleged co-conspirator statements should be barred."   *Id.* at 20.

As the Government correctly points out in opposing the request for a hearing, the First Circuit has long-established precedent on how trial courts should generally make *Petrozziello* rulings.   *See Ciresi*, 697 F.3d at 25 ("[A] district court is not required to make a *Petrozziello* ruling prior to admitting a statement under Rule 801(d)(2)(E). Instead, the court may admit the statement provisionally when it is introduced, deferring a final decision until the close of evidence"); *see also United States v. Ciampaglia*, 628 F.2d 632, 368 (1st Cir. 1980).   The Court views favorably the First Circuit's suggestion that a trial court is better able to assess the admissibility of an alleged co-conspirator statement at trial, where the full context of the statement is before the Court, rather than requiring the Government to put on its evidence twice with a pretrial hearing.

In light of these precedents and on the record presented, the Court concludes a preliminary hearing is not warranted absent unusual circumstances requiring deviation from the "usual course of action in this circuit." *United States v. Faucette*, No. 2:13-CR-79-DBH, 2013 U.S. Dist. LEXIS 95149, at *1-2 (D. Me. July 9, 2013).  As another judge in this District recently observed, the Court "need not make a *Petrozziello* ruling prior to admitting a coconspirator statement—much less make such a ruling prior to trial—and, indeed, there are reasons for not doing so." *United States v. Muller*, No. 1:19-cr-00109-NT-1, 2021 U.S. Dist. LEXIS 136792, at *13 (D. Me. July 22, 2021) (citing *Ciresi*, 697 F.3d at 25).  "Deferring such a ruling allows [the Court] to assess the admissibility of the statement with the benefit of having heard all of the evidence and puts [the Court] in the best position to determine whether the predicate facts for admissibility under Federal Rule of Evidence 801(d)(2)(E) are met." *Id.* (citing *Ciampaglia*, 628 F.2d at 638 (explaining that a district court may provisionally admit coconspirator statements and then "make a final *Petrozziello* determination" "at the close of all the evidence")); *see Faucette*, 2013 U.S. Dist. LEXIS 95149, at *1-2 ("The necessity of a separate hearing for the admission of coconspirator statements has been rejected by the Court of Appeals for the First Circuit") (citing *United States v. Isabel*, 945 F.2d 1193, 1198-99 (1st Cir. 1991)).

The Defendants may challenge the factual sufficiency of the conspiracy alleged in the indictment at trial.  *See Vega-Martínez*, 949 F.3d at 48-49 (noting, after discussing the sufficiency of an indictment, that "[w]hether the evidence was sufficient to back up these assertions was a matter for trial").  The Court denies Mr.

Alkinani's motion for pretrial *Petrozziello* hearing.  *See United States v. Liberty*, No. 2:19-cr-00030-GZS, 2020 U.S. Dist. LEXIS 61324, at *1-2 (D. Me. Apr. 8, 2020) (explaining that the court's decision not to hold a pretrial hearing "is without prejudice to [the Defendants] filing motions in limine as to any specific out-of-court statement that Defendants assert should be excluded").

## IV.   CONCLUSION

The Court DISMISSES without prejudice the joined Motion to Dismiss the Indictment (ECF No. 79).  The Court DENIES in part and DISMISSES without prejudice in part the joined Motion to Preclude Alleged Co-Conspirator Statements and for a Preliminary Hearing to Determine the Existence of a Conspiracy (ECF No. 66).  The Court DENIES so much of the Motion as demands a preliminary hearing and DISMISSES without prejudice so much of the Motion as challenges the ultimate admissibility of the alleged co-conspirator statements.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of August, 2022